## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

| | |
|---|---|
| NATIONAL STARCH AND CHEMICAL TRADING COMPANY, LTD., et al., | ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) Docket No. 05-cv-91-P-S |
| M/V STAR INVENTANA, et al., | ) ) ) |
| Defendants. | ) ) |

### FINDINGS OF FACT & CONCLUSIONS OF LAW

This matter came before the Court for a bench trial, which was held from August 15-17, 2006. At the close of the trial, the Court ordered the parties to submit proposed findings of fact and conclusions of law. The parties filed their proposals on September 14, 2006 (Docket #s 87 & 88) and also filed response briefs (Docket #s 91 & 92) on September 20, 2006.

In connection with this post-trial briefing, Defendants filed a motion titled, "Motion to Strike Portion of Plaintiffs' Response to Defendants Proposed Findings of Fact and Defendants' Correction of Typographical Errors" (Docket # 93). To the extent that this Motion sought to correct typographical errors in Defendants' previous filings, the Motion is GRANTED IN PART. To the extent this Motion sought to strike specific portions of Plaintiffs' Response (Docket # 91), the Motion is DENIED IN PART. However, the Court notes that it has disregarded and given no weight to any material referenced in Plaintiffs' Response that was not entered into evidence during the bench trial.

1

During the course of the bench trial, the Court reserved ruling on the admissibility of some exhibits that the parties sought to have admitted based on various deposition designations. Having had the opportunity to review the relevant deposition testimony, the Court now ADMITS OVER OBJECTION Plaintiffs' Exhibit 22, Plaintiffs' Exhibit 36 and Defendants' Exhibits 19A-19C. The photographs contained in Plaintiffs' Exhibits 31A-F are hereby EXCLUDED based on their duplicative nature and the lack of foundation laid in the designated portions of the deposition testimony.

In accordance with Federal Rule of Civil Procedure 52(a) and having reviewed the parties' post-trial submissions as well as the entire record,[1] the Court now makes the following findings of fact and conclusions of law:

## I.  FINDINGS OF FACT

Plaintiffs National Starch and Chemical Trading Company Ltd. and National Starch and Chemical Trading Co. (together, "National Starch") operate starch processing facilities in the United States, Canada and Thailand.[2] At all times relevant to this case, National Starch produced all of its tapioca starch in Thailand. This tapioca starch was predominately sold as food starch after further processing in the United States. In fact, National Starch has a fifty percent market share on modified starch in the United States,

---

[1] The parties did not arrange for the production of a complete trial transcript. Rather, the parties apparently drafted their proposed findings of fact relying solely on the exhibits, deposition designations and the partial trial testimony of two witnesses that they had transcribed. While it might be tempting to follow the parties' lead and simply assume that the remaining portions of the trial, including the bulk of the actual trial testimony, is apparently irrelevant, the Court in fact ordered and then reviewed the complete trial transcript after it was received on November 6, 2006. The Court's need to request the complete record after the parties had completed their post-trial submissions caused additional delay.

[2] In addition to the National Starch Plaintiffs, Inchem Insurance Company Ltd. ("Inchem") is also a named plaintiff in this action. At all relevant times, Inchem provided insurance coverage to National Starch and has paid National Starch on its claim related to this rejected starch shipment. As a result, Inchem has rights of subrogation and was added as a named plaintiff pursuant to an agreement by the parties. (See Docket #s 13 & 14.) In the context of this Order, the Court's references to National Starch and/or Plaintiffs include Inchem to the extent it is also a named plaintiff.

2

supplying this product to many large food companies. National Starch also produces starch products that are suitable for industrial uses.

Defendants in this admiralty action include the M/V Star Inventana as well as Star Shipping AS ("Star Shipping"), an entity with its principal place of business in Norway, and Masterbulk PTE, Ltd. ("Masterbulk"), an entity with its principal place of business in Singapore. Star Shipping and Masterbulk were the owners and operators of the M/V Star Inventana for all times relevant to this case. Throughout this opinion, the Court will use the terms "Defendants" and "Star Shipping" to refer to all three Defendants.

The present dispute between the parties arises out of a shipment of starch carried aboard the M/V Star Inventana in 2001. This shipment was loaded at the Siam Seaport in Thailand and discharged in Portland, Maine in accordance with the contract, also known as the charter party, entered into between the parties. The terms of the charter party included "full liner terms hook place of rest," which meant that Star Shipping was responsible for the cargo from the time it began loading the cargo onto the M/V Star Inventana until the cargo was discharged to its "place of rest" in Portland, Maine. (Pls. Ex. 23.)

The shipment consisted of approximately seven different varieties of starch packaged in 4,118 jumbo sacks. Each polypropylene jumbo sack had two layers to help protect the starch from moisture and contamination. Each jumbo sack had a spout on the top for filling the sack and a spout on the bottom for discharge. Once filled, each jumbo sack was cube-shaped and weighed approximately one ton.

### A. The Loading of the M/V Star Inventana

After completing its normal procedures and quality control checks, National Starch delivered the 4,118 jumbo sacks to the dock at Siam Seaport for loading. Defendants' responsibility for the 4,118 jumbo sacks began with the loading of the jumbo sacks onto the M/V Star Inventana in the Siam Seaport.

During the loading, there were some weather delays due to rain. During those weather delays, the holds were closed and the stevedores working on the loading were allowed to remain in the hold for the duration of the delay.

Ultimately, all 4,118 jumbo sacks were loaded into Hold 5 of the M/V Star Inventana. Hold 5 was approximately 40 feet long by 86 feet wide and 62 feet deep. The 4,118 jumbo sacks were stacked in 18 layers or tiers within the cargo hold. Except for the bottom and top layers, each tier consisted of 240 jumbo sacks.

Because the hold being used for the starch jumbo sacks was designed for containers, the sides of the hold had container guides. To protect the jumbo sacks from the container guides, plywood was used as a buffer between the jumbo sacks and the container guides.[3] (See, e.g., Joint Exs. 5F, 8B & 8C.)

Upon completion of the loading, Defendants issued clean bills of lading[4] for the 4,118 jumbo sacks of starch.

---

[3] Notably, this use of plywood caused some wood splintering damage to some of the jumbo sacks. However, this damage was ultimately deemed insignificant. In the context of this case, Plaintiffs are not pressing damage claims for wood splintering.

[4] In admiralty, a "bill of lading" is a receipt for cargo issued to the shipper. "A bill of lading which contains no language qualifying the acknowledgment of the apparent good order and condition of the cargo is known as a 'clean' bill of lading." 2A-IV Benedict on Admiralty § 33 (2006).

### B.     The Voyage

The M/V Star Inventana departed Singapore on October 14, 2001 at 0210 local time.  On November 7th and 8th, the vessel encountered exceptionally bad weather, including gale force winds and rough seas.  On November 10, 2001, the Captain filed a Marine Note of Protest noting potential cargo damage that may have occurred due to heavy rolling and pitching of the vessel during the bad weather.  (See Pls. Ex. 26A.)

Despite the delay caused by this weather, the M/V Star Inventana arrived in Portland on November 10, 2001.

### C.     The Unloading of the M/V Star Inventana

The unloading of the M/V Star Inventana began at approximately 1515 local time on November 10, 2001.

The unloading was primarily handled by Merrill Marine Terminal ("MMT") who had been hired to act as the stevedores for Star Shipping.  Thus, MMT was responsible for discharging the starch cargo from the M/V Star Inventana in accordance with any instructions received from Star Shipping and depositing the cargo at the warehouse that was to serve as its place of rest.  Upon deposit of the cargo at its place of rest, MMT's responsibilities to Star Shipping as the stevedore were complete.

In addition to its stevedore relationship with Star Shipping, MMT also had a longstanding relationship with National Starch under which MMT acted as a warehousing agent, meaning it handled the warehousing of various starch products and would ship the product to National Starch facilities on an as-requested basis.

During the unloading, Star Shipping was represented by its appointed port captain, Captain Steven Snell. The port captain was generally responsible for directing MMT in its completion of the discharge.

The unloading began with the top layer (Tier 18) and proceeded down. The jumbo sacks were unloaded ten at a time in a 5 x 2 pattern and loaded onto flat bed trucks for transport to a warehouse.

On Tier 12, MMT discovered a plastic bag containing four to six plastic bottles and what appeared to be human feces. People in the hold noticed a strong stench from the plastic bag. The jumbo sack upon which this contamination was found was visibly stained. As a result, this jumbo sack was segregated and came to be referred to as "the moldy bag." (E.g., Joint Ex. 4.) The Tier 13 bag that rested on top of the moldy bag (with the contaminated plastic bag sandwiched in between) had already been transported to the warehouse and was not segregated from the rest of the shipment. After making a decision to segregate the moldy bag, the discharge was continued.

Separate and apart from "the moldy bag" contamination, at the warehouse, MMT personnel observed and noted crushed glass bottles and shards of glass on some jumbo sacks. This glass contamination was apparently caused by glass beverage bottles that were left in the hold by stevedores in Thailand. This discovery was first made around 0430 on November 11, 2001. MMT's discharge notes also indicate the discovery of additional glass on tier 10 some time after 0500 on November 11, 2001. (See Defs. Ex. 11.) In addition, one foreman's report indicated that glass was found on bags from both tier 9 and tier 8. (See Pls. Ex. 45.) Ultimately, MMT segregated 5 jumbo sacks at the warehouse for suspected glass contamination.

6

There is no evidence suggesting that discharge was suspended due to the observed glass contamination. By all accounts, MMT simply continued the unloading while documenting and segregating out any jumbo sacks it suspected of contamination. The port captain for Star Shipping was apparently not on-site when the contamination was found and testified that he was not contacted regarding how to proceed in light of the contamination.[5] A representative from National Starch was contacted shortly after the contamination was discovered and informed of the plans to continue discharge with segregation of any sacks suspected to be contaminated. While the National Starch representative made an initial inquiry as to whether discharge was or could be suspended, the National Starch representative ultimately did not object to the continued discharge of the shipment.

MMT completed discharge of all of the National Starch cargo at 2250 local time on November 11, 2001. At that time, MMT issued a Damage Report listing "5 bags contaminated with shards of broken glass" and "2 bags molded."[6] (Pls. Ex. 44B.) A vessel representative signed and acknowledged this Damage Report.

Notwithstanding the Damage Report that was completed prior to the departure of the M/V Star Inventana, Walter Watson, the Vice President of Operations for MMT, testified that, by the time he first surveyed the starch cargo in the warehouse, twenty to twenty-five bags had been segregated for various types of contamination, including apparent mold, glass and wood splinters. Armand Demers, also of MMT, testified that he

---

[5] Notably, Captain Snell testified that even if he had been contacted or on-site, he would have likely only suspended the discharge for no more than 10 or 15 minutes. (See Day 2 Tr. (Docket # 96) at 133.)

[6] The second "molded" sack was apparently discolored but not related to the Tier 12 sack upon which a plastic bag apparently containing garbage and fecal matter was found.

observed "maybe a dozen" segregated jumbo sacks during the same time period. (Day 2 Tr. (Docket # 96) at 12.)

**D.     The Extent of the Fecal Contamination**

Only one bag from Tier 12, "the moldy bag," was segregated for apparent fecal contamination. Later sampling of this bag found that "the moldy bag" was, in fact, contaminated with E.coli bacteria. Even Defendant's own expert, Dr. Bruce Stillings, testified that it appeared that fecal contamination had seeped from the plastic bag into the top of the Tier 12 jumbo sack. Dr. Stillings also indicated that sampling of the moldy bag found elevated yeast and mold counts indicative of liquid or moisture seeping into the jumbo sack (most likely from the plastic drink bottles found on top of this jumbo sack).

The Tier 13 bag that rested on top of this "moldy bag" was never located and segregated. Instead, it was apparently taken to the warehouse and stacked with other jumbo sacks according to the storage plan. At least one MMT representative, Walter Watson, testified that attempting to locate the exposed Tier 13 bag jumbo sack would have been "extremely difficult" and analogized the task to attempting to find "a needle in a haystack." (Day 1 Tr. (Docket # 95) 220-21.) In fact, if the bottom of the Tier 13 bag was, in fact, similarly contaminated with E.coli, it is possible that this Tier 13 bag could have exposed at least one other bag to contamination if it was stacked on top of another bag in the warehouse.

Despite the possibility that there were one or two other jumbo sacks affected by fecal contamination, it should be noted that Defendants did sample at least thirty-nine other jumbo sacks and there was no indication of any contamination in these thirty-nine sacks similar to that found in the Tier 12 moldy bag. Nonetheless, the record does not

provide enough information to determine where these thirty-nine sacks were located in relation to the Tier 12 moldy bag.

Ultimately, it is more likely than not that the fecal contamination exceeded the single segregated jumbo sack. While the preponderance of the evidence suggests that the fecal contamination was not widespread throughout the cargo, it is also not possible to pinpoint the affected jumbo sacks and establish a precise "clean margin" beyond which there was no possibility of fecal contamination.

The preponderance of the evidence clearly established that Defendants are responsible for allowing the introduction of the fecal contamination, which appears to have been the result of stevedores remaining in the hold during rain delays. In addition, the preponderance of the evidence established that Defendants bear responsibility for not taking additional steps to isolate the fecal contamination during the unloading process and establishing a "clean margin" beyond which one could reasonably conclude that there was no fecal contamination.

### E. The Extent of the Glass Contamination

During the processing of a bulk food additive, such as starch, glass contamination presents a serious hazard. Because testing for or removing glass contamination is often not possible, National Starch has maintained a "Glass Policy" (Pls. Ex. 34) to prevent glass contamination. Pursuant to the Glass Policy: "All incoming raw material shipments must be inspected for glass and any evidence is reason to reject the receiving load." (Pls. Ex. 34 at 2.) The Glass Policy is part of National Starch's "good manufacturing processes." Customers of National Starch require that the starch they purchase be produced according to "good manufacturing processes" and conduct audits of National

9

Starch facilities to ensure that these processes are followed. As part of its ongoing relationship with National Starch, MMT was aware of the steps it needed to take in order to comply with the Glass Policy.

Dr. Stillings, Defendants' own expert, testified that it would be appropriate to discard any jumbo sack where there was evidence of glass either being embedded in the sack or otherwise entering the sack. In his assessment, the starch in any sack containing such glass contamination would not be suitable for use in human food.

The preponderance of the evidence established that during the loading of the M/V Star Inventana stevedores were allowed to bring glass and plastic beverage bottles into Hold 5 and that at least some of these bottles then remained in the hold. Given the conditions encountered during the voyage as well as during the loading and unloading, it is not surprising that these bottles were broken and that glass shards were able to move within the cargo hold.

Upon discovery of the broken glass bottles during the unloading process, the glass contamination was not adequately isolated. Rather, it is more likely than not that the glass contamination extended beyond the five segregated jumbo sacks and that the glass contamination was spread during the discharge and delivery of the jumbo sacks to the warehouse.

### F.     The Williams' Plan

On November 19, 2001, two representatives from National Starch, Bob Williams and Bill Schaefer, inspected the starch shipment along with two representatives of MMT, Jim Nelligan and Armand Demers, and two surveyors, J.P. Williamson and Brian Hathway. Following this inspection, Williams, the quality assurance manager for the

10

starch division, produced a memo detailing a proposal that would allow National Starch to utilize at least some of the starch shipment after further inspection, cleaning and testing. Schaefer assisted in formulating this proposal since it would have an immediate impact on operations at his plant in Island Falls, Maine. In the context of this trial, Williams' memo, dated November 28, 2001, is commonly referred to as "the Williams' Plan."

The Williams' Plan contemplated inspecting all six sides of each jumbo sack.[7] During this visual inspection, any jumbo sack that had visible glass on any side would be scrapped. Similarly, the Tier 12 moldy bag and any other bag found to have a visible stain similar to that found on the Tier 12 moldy bag would be scrapped. All remaining bags were to be vacuumed with an explosion proof vacuum at the storage facility. Finally, the Plan called for screening all of the starch upon arrival at National Starch processing facilities through either a 100 mesh or 60 mesh screen. (Joint Ex. 4.)

By allowing for the use of the starch that made it through this inspection and cleaning process, the Willimas' Plan would have averted a material shortage that might have led National Starch to close at least one of its processing facilities in Maine. The Plant Manager for the Island Falls facility in Maine, Bill Schaefer, viewed the Williams' Plan as a "best-case scenario to try to recover the starch." (Day 2 Tr. Excerpt (Docket # 89) at 52.)

Assuming the Williams' Plan had been implemented, MMT had estimated that it needed at least ten days to secure adequate warehouse space to conduct the inspection and vacuuming. (See Pls. Ex. 41.) The vacuuming of 4,000 jumbo sacks was estimated

---

[7] Notably, because of the process for unloading and moving the jumbo sacks, this type of visual inspection did not occur upon discharge.

11

to take twenty-eight days (assuming the vacuum was operated for twenty-four hours a day). MMT would have needed to provide four men to complete this project at an estimated cost of $100 per hour ($25 per man, per hour). Thus, MMT's total cost for implementing the William's Plan would have been approximately $67,200.00. In addition to these MMT costs, National Starch would have incurred additional labor and equipment costs to implement the Williams' Plan.

Defendants' own food safety expert, Dr. Stillings, testified that the Williams' Plan would have provided adequate screening of the jumbo sacks for both fecal and glass contamination. Dr. Stillings' opinion is that any jumbo sacks that made it through the Williams' Plan process could be used in food products. This opinion is based on Dr. Stillings' assumption that any sacks that made it through the Williams' Plan process would be free of glass (and fecal) contamination. Ultimately, National Starch did not reach the same conclusion.

### G.   National Starch's Decision to Reject the Shipment

The decision to reject the entire starch shipment was made by Peter Salis, National Starch Vice President for the Industrial Starch and Food Products Division. The decision was made on December 18, 2001 after Salis considered the Williams' Plan and consulted with many other National Starch employees. (See Defs. Ex. 21.)

The decision ultimately required Salis to consider and balance the concerns with respect to the contamination and quality of the shipment against the possible disruption of the starch supply chain. In weighing the decision to reject the shipment as compared to implementing the Williams Plan, Salis was concerned that the testing and cleaning proposed in the Williams Plan might not catch all of the contamination. As a result, Salis

was concerned about a possible negative impact on National Starch's reputation that could result if contaminated starch made its way into the food chain. Salis was especially concerned about the impact of National Starch selling starch for food use that was known to have been exposed to fecal and/or glass contamination. Such a sale would have violated National Starch's own Glass Policy.

In reaching his decision, Salis considered National Starch's previous experience in 1995 with rejection of a tapioca starch shipment that had been contaminated with bacteria due to water exposure. This rejection ultimately led to litigation before the United States District Court, Southern District of New York. See National Starch & Chem. Co. v. M/V Monchegorsk, No. 97 Civ. 1448 KTD, 2000 WL 1132043 (S.D.N.Y. Aug. 9, 2000) (the "Monchegorsk case"). The Monchegorsk case was brought to Salis' attention by Thomas Riley, Assistant General Counsel of National Starch. In fact, Riley was the only person at National Starch who advised Salis to reject the shipment based on his assessment that the situation was analogous to the Monchegorsk case.

Ultimately, Salis "wasn't willing to take that chance with the food supply" and decided to reject the shipment. (Day 1 Trial Tr. (Docket # 95) 34.)

After being notified of National Starch's decision to reject the entire shipment, Star Shipping requested an opportunity to sample and test the rejected cargo. At first, National Starch rejected this request. However, after moving the rejected starch from the Portland warehouse to a warehouse in South Portland, National Starch did permit Star Shipping access to the rejected starch cargo for sampling. As a result of the warehouse move, the jumbo sacks were no longer in the same order. Thus, locating which jumbo sacks came from a particular tier of the M/V Star Inventana shipment was no longer

possible. Nonetheless, Star Shipping was able to inspect and observe twenty jumbo sacks that had been segregated for suspected contamination, including the Tier 12 "moldy bag." At the South Portland warehouse, Star Shipping sampled a total of thirty-nine jumbo sacks.

National Starch ultimately filed an insurance claim on the rejected starch shipment and received reimbursement from its insurance company, Inchem. Inchem proceeded to make arrangements to salvage the rejected cargo for sale in non-food uses. The salvage broker enlisted by the insurance company made its first sale of the rejected starch in March 2002. After this initial sale was made, the broker was instructed to suspend sales while the Plaintiffs attempted to finalize a Hold Harmless Agreement that was to be used in connection with the sale of the rejected starch. Although there is some indication that the Hold Harmless Agreement was finalized by July 2002, the salvage broker did not receive the finalized Hold Harmless Agreement and approval to resume sales until January 2003. Ultimately, the net proceeds of the salvage sale were $134,016.13.

## II. CONCLUSIONS OF LAW

1. This action arises under the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. App. §§ 1300-1315, giving this Court jurisdiction pursuant to 28 U.S.C. § 1331.

2. The requirements of 46 U.S.C. App. § 1303(6) with respect to notice of damage were satisfied by the joint inspection undertaken on November 19, 2001.

3. Under COGSA, a plaintiff may establish a prima facie case of damage by establishing by preponderance of the evidence that the goods were delivered to the shipper undamaged and discharged in a damaged condition. See, e.g., United States v.

Ocean Bulk Ships, Inc., 248 F.3d 331, 336 (5th Cir. 2001). In this case, Plaintiffs established a prima facie case of damage to their starch shipment in light of the clean bills of lading issued on October 10, 2001 (Pls. Ex. 24) and the undisputed evidence that glass and fecal contamination were found in the shipment upon discharge.

4. By establishing a prima facie case, Plaintiffs have shifted the burden of proof to Defendants to prove that Defendants either "exercised due diligence to prevent the loss or damage to the cargo, 46 U.S.C. App. § 1304(1), or . . . that the loss or damage was the result of one of [COGSA]'s enumerated 'uncontrollable causes of loss,' id. at § 1304(2)." Ocean Bulk Ships, 248 F.3d at 336; see also M/V Monchegorsk, 2000 WL 1332043 at *6.

5. In short, Defendants failed to exercise due diligence by allowing the introduction of glass and fecal matter and thereby contaminating the starch shipment. Defendants also failed to exercise due diligence upon discovery of both the fecal contamination and glass contamination. If additional steps had been taken upon discovery of the contamination to ensure segregation of all potentially affected jumbo sacks and establish "clear margins" for the contamination, it might have been possible to salvage some of the shipment. However, even if this due diligence in discharge had occurred, the "salvaged" starch would have still been required to go through additional inspection, vacuuming and screening as outlined in the Williams' Plan. Ultimately, Defendants would have been responsible for these reconditioning costs.

6. Contrary to Defendants' arguments, the Court does not conclude that Plaintiffs were required to inspect and test each of the 4,118 jumbo sacks in order to claim damages for any individual sack. It might be reasonable to require this type of per-package proof

15

if this case were only about fecal contamination, which can be easily detected with laboratory testing. However, this case also presented serious glass contamination issues. National Starch's concern that glass contamination could not be isolated and/or cured by the Williams' Plan or any other additional inspection, cleaning or testing was reasonable. Moreover, its decision to reject the entire shipment in light of the glass contamination and thereby prevent any glass contamination from entering the food chain or its facilities was in accordance with its regular practices and policies.

7.  Defendants also argue that the record supports finding that the top tiers of the cargo were, in fact, clean and suitable for use in human food. For purposes of this argument, the Court assumes that the "clean top" consisted of 216 jumbo sacks of Purity 87 starch, 220 sacks of Sago starch and 475 sacks of Novbase starch, all of which were stowed in Tiers 14-18.[8] (See Joint Ex. 2.) Together, this "clean top" cargo had an invoice value of $269,781.50. Admittedly, on the record presented, the question of whether the rejection of this "clean top" cargo was reasonable presents a close call. If National Starch had not rejected this "clean top" cargo, the cargo would have been required to pass a "Williams' Plan"-type inspection before it was used. Thus, at the very least, Plaintiffs would be entitled to recover the costs of reconditioning on each of these "clean top" sacks and this cost would have easily exceeded $20,000.00.

8.  Regardless of whether this "clean top" issue is considered under the burden-shifting COGSA liability scheme or under the affirmative defense of failure to mitigate, Defendants bear the burden of proving that they diligently preserved the "clean top" and

---

[8] The Court does not include the 95 sacks of Nat. 916-70 starch stowed in Tier 14 within the clean top based on its conclusion that there is no way of distinguishing these 95 sacks from the 232 sacks of Nat. 916-70 stowed in Tier 13 and the 152 sacks of Nat 916-70 stowed in Tier 12. Notably, the record suggests that "the moldy bag" was a sack containing Nat. 916-70.

16

that the failure to adopt and carry out the Williams' Plan with respect to the "clean top" was somehow unreasonable. In the Court's final assessment, Defendants have not met this burden and, therefore, the Court will allow Plaintiffs to recover damages on the "clean top" portion of the rejected cargo.

9. To the extent Defendants have argued that Plaintiffs failed to mitigate their damages, this is an affirmative defense for which Defendants bear the burden of proof. See Shonac Corp. v. Maersk, Inc., 159 F. Supp. 2d 1020, 1031 (S.D. Ohio 2001). Defendants have not met this burden and, on the record presented, the Court concludes that Plaintiffs generally satisfied their duty to mitigate by selling the rejected starch for non-food use. Contrary to Defendants' arguments, the Court finds no basis for concluding that Plaintiffs could have or should have found some "industrial use" for the rejected cargo within their own facilities. However, the Court does find that Plaintiffs unreasonably delayed the salvage sale of the rejected cargo incurring unnecessary storage costs. Therefore, the Court will limit its award of storage costs.

9. In light of the above conclusions, Plaintiffs are entitled to an award of damages, subject to COGSA's $500 per package limit. On the record presented, the Court calculates Plaintiffs' damages as follows:

**Invoice value of cargo (See Joint Ex. 7):**            **$1,165,854.00**

| Description | Number of Sacks | Amount |
|---|---|---|
| 916-70 | 480 | 240,000.00 |
| Purity 87 | 216 | 95,472.00 |
| 52-2018 | 1070 | 254,660.00 |
| Dexbase | 829 | 204,348.50 |

| | | |
|---|---|---|
| Dexbase | 250 | 59,500.00 |
| Novbase | 475 | 117, 087.50 |
| Dexbase | 578 | 137, 564.00 |
| Sago | 220 | 57, 222.00 |

**Ocean Freight:** $303, 551.62

**Reasonable Storage Costs (9 months x $9991.80 per month):** $89,926.20

**Subtotal:** $1,559,331.82

*Minus Net Salvage:* *- $134,016.13*

**Total Damages:** <u>**$1,425,315.69**</u>

10. The Court also awards Plaintiffs prejudgment interest. See <u>City of Milwaukee v. Cement Division, National Gypsum</u>, 515 U.S. 189, 195 (1995). Without supporting citation, Plaintiffs requested that the Court set the prejudgment interest rate at 7.25%. However, the Court will follow the lead of another court in this district. In <u>Grande v. St. Paul Fire & Marine Insurance Co.</u>, -- F. Supp. 2d ---, 2006 WL 3072561 (D. Me. Oct. 27, 2006), the district court set the prejudgment interest rate by relying on 14 M.R.S.A. § 1602-B. Following <u>Grande</u>, the Court sets the prejudgment interest rate in this case at 5.77 %.[9]

---

[9] The Court has used the one-year United States Treasury bill rate for the last full week of 2004, noting that the complaint in this case was filed in 2005. See
http://www.federalreserve.gov/releases/h15/data/Weekly_Friday_/H15_TCMNOM_Y1.txt .

**III.    CONCLUSION**

The Court hereby directs the Clerk to enter judgment in favor of Plaintiffs in the amount of one million, four hundred twenty-five thousand, three hundred and fifteen dollars and sixty-nine cents ($1,425,315.69), plus interest and costs.  With respect to prejudgment interest, Defendants shall pay Plaintiffs prejudgment interest at the rate of 5.77% in accordance with 14 M.R.S.A. § 1602-B.

SO ORDERED.

                                                /s/ George Z. Singal
                                          Chief United States District Judge

Dated this 6th day of December 2006.